IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Billy Smith,                                    )
                                                )     Civil Action No. 6:11-2151-DCN-KFM
                        Plaintiff,              )
                                                )     **REPORT OF MAGISTRATE JUDGE**
            vs.                                 )
                                                )
Michael J. Astrue,                              )
Commissioner of Social Security,                )
                                                )
                        Defendant.              )
                                                )

       This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

       The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

       The plaintiff filed an application for disability insurance benefits ("DIB") on August 9, 2007, alleging that he became unable to work on May 10, 2007. The application was denied initially and on reconsideration by the Social Security Administration. On May 20, 2008, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Janette Clifford, an impartial vocational expert, appeared on September 21, 2009, considered the case *de novo*, and on February 12, 2010, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on April 14, 2011.  The plaintiff then filed this action for judicial review on August 15, 2011.  On February 23, 2012, the plaintiff filed a motion to remand for consideration of new and material evidence pursuant to sentence six of 42 U.S.C. § 405(g) (doc. 15).

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.
>
> 2.  The claimant has not engaged in substantial gainful activity since May 10, 2007, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).
>
> 3.  The claimant has the following severe impairments: degenerative disc disease, status post anterior cervical disc excision and fusion, status post cervical endoscopic nerve root decompression, carpal tunnel syndrome, depression, and anxiety (20 C.F.R. § 404.1520(c)).
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> 5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except:  he is restricted from climbing of ladders; is limited to only occasional balancing, stooping, kneeling, crouching, and crawling; and is limited to work requiring frequent but not constant overhead reaching and handling.  The claimant is further limited to work involving simple, routine, repetitive tasks, with only occasional public contact.

6.  The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

7.  The claimant was born on November 21, 1961, and was 45 years old, which is defined as a younger individual age 18-49, on the alleged onset date (20 C.F.R. § 404.1563).

8.  The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404. Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from May 10, 2007, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

3

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments

4

which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

On February 14, 2005, the plaintiff sustained an injury when he fell down a flight of stairs. Initially, he saw a doctor who told him he had a pinched nerve, and he was treated with two epidural steroid injections, without improvement. An MRI study in April 2005 showed multi-level degenerative disk disease, with osteophyte formation and foraminal narrowing, greatest at C5-6. In September 2005, the plaintiff was examined by

5

Edward Hanley, M.D.  On examination, the plaintiff exhibited cervical spine tenderness, greater on the right; 4/5 weakness in the wrist extensors on the right; and decreased cervical range of motion, with complaints of pain in his upper right extremity.  Dr. Hanley diagnosed neck pain and C6 radiculopathy in the right upper extremity, related to cervical spondylosis and herniated disc foraminal stenosis at C6 (Tr. 221).

On November 23, 2005, the plaintiff underwent surgery for anterior cervical disc excision and fusion at CS-6 and C6-7.  There were no complications, and initially the plaintiff's surgery was successful; he had immediate relief of the radiculopathy while in the hospital, and two weeks after the operation had only mild discomfort in his neck and shoulders (Tr. 219).

On January 4, 2006, Dr. Hanley indicated that the plaintiff was "generally doing well" and had some "slight achy neck discomfort." The plaintiff was to remain on diminished activity (Tr. 218). On February 7, 2006, Dr. Hanley saw the plaintiff, who reported having some aching neck discomfort and shoulder area pain of mild severity. Range of motion of Smith's neck was 80% (Tr. 217).  The plaintiff was released to return to work on March 1, 2006, without restriction (Tr. 217).

On March 9, 2006, the plaintiff reported to Dr. Hanley that he had returned to work.  He had no upper extremity radiculopathy.  His main problem at that time was pain in the medial aspect of the left elbow.  The plaintiff was advised to rest his forearm, but otherwise he could participate in full activity (Tr. 216).

On July 26, 2006, Dr. Hanley evaluated the plaintiff for upper right extremity and neck discomfort. X-rays showed extensive degenerative change, and Dr. Hanley ordered an MRI. The plaintiff's range of motion was 80%, and his "neurologic intact with exception of questionable decreased grip strength and wrist extension on right side" (Tr. 215).  An MRI on August 10, 2006, showed status post anterior fusion C5 through C7, cervical spondylosis with multilevel disc osteophyte complexes, which contact the cord at

6

C3-4 and C4-5 levels. Uncovertebral joint changes contributory to mild to moderate foraminal narrowing as detailed above, and mild canal stenosis C3-4 through C6-7 (Tr. 276-77).

On August 24, 2006, Dr. Hanley noted the plaintiff complained of radicular pain and numbness in his right upper extremity into his hand. Dr. Hanley diagnosed recurrent radiculopathy of the right upper extremity and adjacent segment spondylosis. He ordered an epidural injection (Tr. 214). On September 20, 2006, Dr. Hanley noted that the plaintiff's epidural injection was of no benefit. The plaintiff reported a pain level of 9 out of 10. He had slight weakness of wrist extensors on the right and decreased sensation of his index, middle, and ring finger on the right. Dr. Hanley diagnosed residual recurrent radiculopathy of C6 and C7. Dr. Hanley advised the plaintiff to consider surgery and prescribed hydrocodone for pain (Tr. 212-13).

On November 22, 2006, Dr. Hanley reevaluated the plaintiff for neck pain and upper extremity, hand, and arm numbness. Dr. Hanley stated the plaintiff was "reluctant to consider any further surgery, which I understand" and ordered EMG studies (Tr. 211). EMG and nerve conduction studies on December 7, 2006, showed moderately severe right-sided median neuropathy consistent with carpel tunnel syndrome and right-sided cervical radiculopathy (Tr. 243-44).

On December 14, 2006, after evaluating the plaintiff and reviewing the EMG studies, Dr. Hanley diagnosed status post anterior cervical disk excision and fusion C5-6 and C6-7 with residual chronic C6 radiculopathy, possible C7 symptoms; and carpal tunnel syndrome right, electrodiagnostically confirmed. Dr. Hanley administered a carpal tunnel epidural injection (Tr. 210).

On January 16, 2007, Dr. Hanley noted that the plaintiff's carpel tunnel symptoms had been helped by the injection, but his radiculopathy was worse. The plaintiff had tenderness in his cervical region, decreased extension of his neck, with 4 over 5

7

weakness of wrist extensors on the right, questionable decreased sensation in the C6 distribution dorsum of his index finger and thumb on his right hand, and questionable mild decreased sensation of his median nerve distribution in the palmar aspect of his right hand. It was decided to proceed with cervical surgery since the plaintiff reported that his neck was his most severe problem. Dr. Hanley indicated that carpal tunnel release may be appropriate after treatment of the cervical condition (Tr. 209).

In April and May 2007, the plaintiff was examined by Said Elshihabi, M.D. Dr. Elshihabi's findings were similar to Dr. Hanley's, and he also recommended surgery (Tr. 228-34).

In May 2007, the plaintiff underwent a second surgery for endoscopic nerve root decompression; as before, he had immediate initial relief of pain, but some continued discomfort in his shoulder and residual hand numbness (Tr. 235, 238-39).

On June 14, 2007, Dr. Elshihabi noted residual numbness in the plaintiff's hand and shoulder discomfort, but the significant right arm pain and weakness had resolved. He diagnosed cervical radiculopathy and recommended that he avoid heavy duty work (Tr. 235-36). Dr. Elshihabi also provided an "out of work" note for the current time (Tr. 237).

On July 26, 2007, Dr. Elshihabi noted continued persistent right arm numbness and tingling. The plaintiff had not been able to return back to any level of work duty or function. The plaintiff also complained of symptoms suggestive of carpal tunnel in the right hand (Tr. 238-39).

A CT myelogram on August 9, 2007, showed significant degenerative changes at C4-5 and C5-6, but no canal or myelopathic findings (Tr. 240).  On that same date, Dr. Elshihabi indicated that the plaintiff did "not appear to be clinically healed in regard to his neck and upper the symptoms." Dr. Elshihabi advised continued management. He

8

planned to review the plaintiff's possible need for extension of his fusion (Tr. 240-41). On this date Dr. Elshihabi also provided another "out of work" slip (Tr. 242).

On September 13, 2007, Dr. Elshihabi evaluated the plaintiff who reported no significant benefit from therapy. His neurological examination had remained unchanged, and he continued wearing his cervical collar. Dr. Elshihabi's diagnoses were cervical radiculopathy, carpal tunnel syndrome, cervical spondylosis, and neck pain. Dr. Elshihabi recommended a selective nerve root block at the right C4-5 junction (Tr. 314-15). Dr. Elshihabi also wrote for the plaintiff to continue out of work (Tr. 317).

On September 24, 2007, Ratko Vujicic, M.D., evaluated the plaintiff for neck pain. He complained of pain, weakness, tingling numbness, fatigue, headache, trouble sleeping, dizziness, depression, stress, and suicidal ideation. The plaintiff had limited neck range of motion, tenderness in his back, and diminished grip strength of the right hand. Dr. Vujicic diagnosed cervical radiculopathy and facet arthropathy and administered a cervical epidural injection (Tr. 442-44).

On October 4, 2007, Dr. Elshihabi evaluated the plaintiff following his nerve root block. The plaintiff reported that his arm symptoms had resolved since the injection but that his carpal tunnel symptoms had worsened. Dr. Elshihabi's diagnoses remained the same, and he advised continued conservative management and ordered an EMG (Tr. 320-21).

In October 2007, the plaintiff was seen on an emergency basis at Catawba Mental Health Center; he reported to the counselor who interviewed him that he was having significant problems with pain and was worried a lot by a number of pressures, including family and financial pressures (Tr. 361, 364-71). The counselor noted that there were "no co-occurring disabilities." The plaintiff said he had considered suicide and was having trouble dealing with the changes in his life caused by his pain (Tr. 371). He reported his mood as "depressed" and described disturbed sleep, as well as visual and audio

hallucinations (Tr. 371). During a follow up appointment and full evaluation, the plaintiff admitted a prior history of alcohol and cannabis use but stated he had not used either substance in ten years. He was diagnosed with major depressive disorder, single episode, and anxiety, caused by what by what the counselor called "phase of life problems" (Tr. 414).

On October 29, 2007, Robert Kukla, M.D., reviewed the plaintiff's medical records and assessed his residual functional capacity ("RFC") (Tr. 255-62, 265-72). He found the plaintiff capable of lifting and carrying 20 pounds occasionally and ten pounds frequently, standing/walking about six hours in an eight-hour workday, sitting about six hours in an eight-hour workday. Dr. Kukla found all postural abilities limited to occasional (Tr. 255-62).

On November 9, 2007, Mark D. Smith, M.D., a neurosurgeon, refilled the plaintiff's prescriptions for Ultram and Flexeril (Tr. 325). On November 14, 2007, Dr. Smith evaluated the plaintiff noting improvement of his radiculopathy, but discussed the possibility of additional surgery possibly being needed in the future. The plaintiff stated that, overall, he was happy with his current level of difficulty. The plaintiff was advised to return on an as needed basis (Tr. 353). On November 21, 2007, Dr. Smith provided a statement indicating that the plaintiff's surgery was due to his work-related injury and that he suffered from a 12% permanent impairment as a result (Tr. 355).

On December 4, 2007, Carlton Gay, M.D., rated the plaintiff's Global Assessment of Functioning ("GAF") at 50[2] (Tr. 362-63). The plaintiff had a flat affect and psychomotor retardation. There was indication of some degree of possible exaggeration or malingering due to responses that were consistently one digit or letter off and lengthy

---

[2] A GAF score of 41-50 indicates a person has "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. text revision 2000).

pauses before responding. The plaintiff's diagnoses were major depressive disorder, single episode; phase of life problems; and, anxiety (Tr. 362-63).

On December 27, 2007, Steven Poletti, M.D., saw the plaintiff for an independent medical evaluation.  He noted that the plaintiff had some decreased thumb and grip strength and pain with forward flexion (Tr. 375).  He recommended that the plaintiff avoid heavy lifting, bending, twisting, pushing, and pulling (Tr. 376).  Dr. Poletti found as follows:

> This man has undergone surgery x2 on his cervical spine, once anteriorly and once posteriorly. With regards to the anterior surgery I have ascribed him a thirty percent impairment rating for segmental instability with radiculopathy with an additional level of ankylosis restricting his motion. With a diagnosis of radiculopathy at a separate level and separate surgery for a posterior decompression at the C4-S level we would ascribe an additional fifteen percent for radiculopathy necessitating surgical intervention. This would ascribe him a forty five percent impairment rating. His impairment is twenty five percent for segmental instability with radiculopathy at the C5-6 level. Additional level at C6-7 ascribed an additional five percent impairment and fifteen percent for the posterior decompression at a separate level at C4-5.

(Tr. 375).

On February 6, 2008, Dr. Gay of South Carolina Mental Health evaluated the plaintiff and found his concentration distractible and attitude apathetic.  The plaintiff was worried and had complaints of physical pain in his back, hands, and fingers.  His speech was slow, and his motor activity showed retardation. The plaintiff was alert and oriented, and his affect was restricted.  Dr. Gay noted that the plaintiff had just started Remeron and would need to wait to see the "full effects" of this medication (Tr. 382-83).  In March 2008, Dr. Gay indicated that the plaintiff was fully oriented and had intact thought process and appropriate thought content, with depressed mood. Diagnoses were major depressive disorder, anxiety NOS, and phase of life problems. Dr. Gay stated that the plaintiff's

11

depression was improving "somewhat" with Remeron. He thought the plaintiff had moderate or severe work-related limitations and was able to manage his own funds (Tr. 414).

A Physical Residual Functional Capacity Assessment was completed by Steven Fass, M.D., on March 21, 2008.  He found the plaintiff capable of lifting and carrying twenty pounds occasionally and ten pounds frequently, standing/walking about six hours in an eight-hour workday, and sitting about six hours in an eight-hour workday. Dr. Fass found all postural abilities limited to occasional with the exception of never being able to climb ladders, ropes, or scaffolds. Dr. Fass also found that the plaintiff would need to avoid concentrated exposure to hazards due to chronic pain causing decreased agility and mobility. Dr. Fass noted that inconsistencies between the plaintiff's symptoms and the diagnostic testing raised questions about credibility, noting there were "minimal abnormal physical exam findings to support level of alleged limitations." Dr. Fass indicated that the plaintiff would be limited to light work (Tr. 405-12).

In April 2008, Lisa Varner, Ph.D., reviewed the plaintiff's medical records and assessed the limitations caused by his mental impairments (Tr. 417-430).  Dr. Varner concluded that the plaintiff had severe mental impairments, an affective disorder, and an anxiety disorder that caused moderate limitations, but no episodes of decompensation (Tr. 417, 420, 422, 427).  She opined that the plaintiff was able to understand, remember, and carry out simple instructions; could maintain concentration for two hours; would be best not working with the public; and would be able to be aware of normal work hazards (Tr. 433).

On April 30, 2008, Dr. Gay reevaluated the plaintiff. The plaintiff reported that he had started going to a 12-step program. He stated, "I just go for the help. I don't drink or do drugs. Lets me see people are going through worse things and helps me deal with people and problems."  The plaintiff's mood was sad, and his affect was restricted.  Dr. Gay added Abilify to the plaintiff's prescriptions (Tr. 464-65).  On July 8, 2008, Dr. Gay evaluated

the plaintiff for irritability. He had restricted affect and slow speech and though process. Dr. Gay increased the plaintiff's dose of Abilify (Tr. 462-63).

On August 25, 2008, the plaintiff was evaluated at the Lewisville Medical Center for pain and numbness in his right arm and hand. He had diminished gross sensation and diminished muscle strength in the right hand. Jonathan Liu, M.D., diagnosed cervical radiculopathy and refilled the plaintiff's prescriptions, including Lortab, cyclobenzaprine, tramadol, diazepam, and mirtazapine (Tr. 453).

On October 15, 2008, Dr. Gay evaluated the plaintiff who complained of trouble concentrating and taking "a while to get up and going." He also complained of being tired and indicated that his medications "keep me tired." Dr. Gay indicated that the plaintiff was generally doing "fair." The plaintiff continued to have retardation of motor activity. Dr. Gay stated that he had interval improvement in mood and sleep but anxiety was unchanged (Tr. 459-60).

On January 9, 2009, Dr. Liu evaluated the plaintiff for complaints of neck pain, right arm pain with a burning sensation in his hand, and right knee swelling. The plaintiff complained that his medications were not helping "as much anymore." He stated that he was starting to drop things and felt his right upper extremity was weakening. Dr. Liu diagnosed cervical radiculopathy and advised the plaintiff that he really needed a referral to neurosurgery and that his condition could progress to paralysis with time. The plaintiff indicated that he did not have insurance and would discuss this matter with his wife. Dr. Liu also diagnosed degenerative joint disease of the right knee and hypertension, noting that the plaintiff's hypertension was not good, and increasing the dose of the plaintiff's prescription for lisinopril (Tr. 450-51).

In January 2009, the plaintiff told Dr. Gay that his medications were helping him sleep fairly well and that he had no adverse medications and was satisfied with his current medications. The plaintiff stated that he thought if his "pain weren't so bad, I think

13

my mood would be fair." Dr. Gay stated that the plaintiff's pain "appeared to be limiting factor in overall status improvement" (Tr. 457-58).

On May 7, 2009, Dr. Gay noted the plaintiff stated that trazodone was good for sleep and that when he took some during the day it helped calm him down. The plaintiff also stated that he had to stop Klonopin because he could not afford it (Tr. 454-55).

On May 21, 2009, Sameer Vemuri, M.D., of Carolina Neurosurgery and Spine, evaluated the plaintiff, who complained of neck pain, right and left shoulder pain, right and left arm pain, and numbness in his arms and hands. Dr. Vemuri performed a physical examination and record review. Dr. Vemuri ordered an MRI and EMG and nerve conduction studies (Tr. 470-73). The plaintiff had an MRI of his cervical spine on June 3, 2009, which showed: 1) status post C5-C7 anterior cervical fusion; 2) C4-C5 right paracentral disc protrusion encroaching on exiting right C5 nerve root and resulting in mild right hemi canal stenosis with AP canal diameter measuring 8.5 mm; 3) C5-C6 right paracentral osteophyte without discrete cord impingement or significant central stenosis; and, 4) bilateral C3-C4, C4-C5, right C5-C6 neural foraminal stenoses (Tr. 480-81). The plaintiff had an EMG and nerve conduction study on June 5, 2009, which showed at least a moderate severity median nerve entrapment neuropathy across the wrist on the right and at least a mild severity median entrapment neuropathy across the wrist on the left (Tr. 474-79).

On June 23, 2009, Jonathan Lake, PAC, of Carolina Neurosurgery and Spine, evaluated the plaintiff for severe pain in his right wrist radiating into his right hand and associated with numbness and tingling of his thumb, index, and middle fingers. Mr. Lake reviewed the plaintiff's EMG. Mr. Lake diagnosed carpal tunnel syndrome and stated, "Mr. Smith is visible with carpal tunnel syndrome. We will plan for a right endoscopic carpal tunnel release" (Tr. 468-69).

14

On July 1, 2009, the plaintiff was treated at Lewisville Medical Center for radiculopathy and muscle weakness of the right hand (Tr. 484-85).

At the hearing on September 21, 2009, the ALJ noted that the plaintiff had difficulty raising his right hand, and the plaintiff said he had pain in both upper extremities (Tr. 38). The plaintiff said the pain came and went in his shoulder and that he had the most pain in his lower back and radiating down his arm (Tr. 42). He said that he also had neck pain. He admitted that medication helped the pain (Tr. 43). He said that the medication caused side effects, drowsiness and dizziness. He said he took the medications three or four times a day, and, after each dose, he had to lay down for two or three hours (Tr. 54). He also complained of depression and said he had problems concentrating and remembering (Tr. 57).

The plaintiff said that he had injured himself on the job and received a worker's compensation award of $100,000 lump sum payment the August before the hearing and some money on a weekly basis (Tr. 45). The plaintiff said that he could not grip small things and was unable to lift a jug of milk with his right hand and that his left hand was weak. He said his back pain limited him to sitting 15 or 20 minutes at one time. He said that right hip pain limited him to standing 20 minutes at one time. He said he had difficulties walking 25 feet (Tr. 56). He denied doing housework or yard work (Tr. 57). He said he could not work because he had trouble sleeping and had side effects from medication (Tr. 58).

Jeanette Clifford, a vocational expert, also testified at the hearing (Tr. 59). Ms. Clifford testified that the plaintiff's past work was as a maintenance mechanic in textiles, which was skilled work requiring heavy exertion. The ALJ asked Ms. Clifford a hypothetical question that assumed a person of the plaintiff's age, with the same work history and educational background, who could perform a range of light work (Tr. 59-60). Ms. Clifford testified that the person could perform the jobs of classifier and folder, identifying the

15

*Dictionary of Occupational Titles* ("*DOT*") number and the number of jobs in the economy for each of the jobs (Tr. 61).

After the ALJ's decision denying the plaintiff's request for disability benefits was issued on February 12, 2010, the plaintiff filed a request for review by the Appeals Council. The Appeals Council denied the request for review on April 14, 2011 (Tr. 5-7). The Appeals Council found as follows in that decision:

> [T]he Appeals Council considered the fact that since the date of the Administrative Law Judge's decision, you were found to be under a disability beginning February 13, 2010 for a period of disability, Disability Insurance Benefits and June 10, 2010 for Supplemental Security Income, based on the applications you filed on June 10, 2010; however, the Council found that this information does not warrant a change in the Administrative Law Judge's decision.

(Tr. 6). The Appeals Council did not place the favorable decision in the subsequent case in the record.[3]

## ANALYSIS

The plaintiff alleges disability commencing May 10, 2007, at which time he was 45 years old. He was 48 years old on the date of the ALJ's decision. He has a tenth grade education and past relevant work as a maintenance repair mechanic in the textile industry and as a maintenance repairman in a housing complex. The ALJ found that the plaintiff's degenerative disc disease, status post anterior cervical disc excision and fusion, status post cervical endoscopic nerve root decompression, carpal tunnel syndrome, depression, and anxiety were severe impairments. The ALJ further determined that the plaintiff could perform light work except that he is restricted from more than occasional climbing of stairs; is restricted from climbing ladders; is limited to only occasional balancing, stooping, kneeling, crouching, and crawling; and is limited to work requiring frequent but not

---

[3]The plaintiff submitted a copy of the favorable decision, dated November 12, 2010, as an exhibit to his motion to remand (doc. 15-1).

constant overhead reaching and handling. The ALJ further found that the plaintiff is limited to work involving simple, routine, repetitive tasks, with only occasional public contact. The plaintiff argues the ALJ erred by: (1) failing to consider his mental and physical impairments in combination; (2) failing to properly consider evidence proffered by Dr. Gay; (3) failing to consider the side effects of his medication; and (4) making an assumption about his failure to obtain treatment without the requisite investigation. The plaintiff has also moved to remand the case under sentence six of 42 U.S.C § 405(g), arguing the subsequent favorable decision is new and material evidence (doc. 15). The plaintiff also argues that remand is necessary because the "court 'cannot determine whether substantial evidence supports the ALJ's denial'" (pl. brief 27 (quoting *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011)).

***Combined Effect of Impairments***

The plaintiff first argues that the ALJ failed to properly consider the combined effect of his multiple impairments. When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability. Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)). The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. § 404.1523.

17

This court finds that the ALJ adequately considered the combined effect of the plaintiff's impairments at each step of the sequential evaluation process. At step two, the ALJ found the plaintiff had the following severe impairments: degenerative disc disease, status post anterior cervical disc excision and fusion, status post cervical endoscopic nerve root decompression, carpal tunnel syndrome, depression, and anxiety (Tr. 17-18). He further found that while the plaintiff had been diagnosed with high blood pressure, it was well controlled with medication and had no more than a minimal impact on his ability to perform basic work activities. Thus, it was a nonsevere impairment (Tr. 18). At step three, the ALJ referred to the plaintiff's "combination of impairments" in making his detailed listings assessment (Tr. 19-20). He further stated that he carefully considered "the entire record" and "all symptoms" in making his RFC finding (Tr. 21) and acknowledged the requirement that he consider "all" of the plaintiff's impairments, including those that were not "severe" (Tr. 16). The ALJ went on to discuss the overall functional effects of the plaintiff's impairments, including specific exertional and postural functional restrictions as well as nonexertional restrictions, in the RFC assessment (Tr. 21-26). Based upon the foregoing, this court finds that the ALJ adequately considered the combined effect of the plaintiff's multiple impairments. *See Thornsberry v. Astrue*, No. 4:08-4075-HMH-TER, 2010 WL 146483, at *5 (D.S.C. Jan. 12, 2010) ("[T]he court finds that while the ALJ could have been more explicit in stating that his decision dealt with the combination of [the claimant's] impairments, his overall findings adequately evaluate the combined effect of [the claimant's] impairments."); *Ingram v. Astrue*, No. 3:07-cv-823-GRA, 2008 WL 3823859, at *2 (D.S.C. Aug. 12, 2008) [T]he ALJ's separate discussion of each of Plaintiff's impairments indicates that he considered them in combination."). Accordingly, this allegation of error is without merit.

18

***Opinion Evidence***

The plaintiff next argues that the ALJ failed to properly consider the opinion of treating physician Dr. Gay.  The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list:  (1)  the length of the treatment relationship and the frequency of the examinations; (2)  the nature and extent of the treatment relationship; (3)  the evidence with which the physician supports his opinion; (4)  the consistency of the opinion; and (5)  whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions.   These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927].  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

19

*Id.* at *4.

The plaintiff claims that the ALJ erred in evaluating the opinion evidence because he did not specifically discount Dr. Gay's GAF rating of 50 in December 2007 (pl. brief 29-30 (citing Tr. 362-63)). The ALJ discussed Dr. Gay's treatment notes (Tr. 23-24), noting that the staff at Catawba Mental Health felt the plaintiff may have been malingering or misrepresenting his mental impairment by exaggerating his symptoms (Tr. 23). Dr. Gay stated on December 4, 2007, that there was indication of some degree of possible exaggeration or malingering due to the plaintiff's responses that were consistently one digit or letter off and lengthy pauses before responding (Tr. 23; *see* Tr. 362-63). Notably, this was the same appointment during which Dr. Gay opined that the plaintiff's GAF was 50 (Tr. 362-63). The ALJ also noted that Dr. Gay's treatment notes showed the plaintiff had improved with treatment (Tr. 24). For instance, in May 2009, Dr. Gay's notes reflect the absence of psychotic symptoms, fair energy and concentration, no homicidal or suicidal symptoms, and a fair mood. Dr. Gay stated that the plaintiff's thought processes were positive and goal directed and that the plaintiff described his mood as "fair, I guess" (Tr. 24; *see* Tr. 454-55). Moreover, in March 2008, Dr. Gay opined that the plaintiff's impairments were moderate to severe (Tr. 414). Thus, the plaintiff has not shown that he had a GAF of 50 (which is at the top of the scale for serious symptoms and only one point from moderate symptoms), for long enough to be disabling. *See Barnhart v. Walton*, 535 U.S. 212, 217 (2002) (recognizing a claimant is not disabled if "'within 12 months after the onset of an impairment . . . the impairment no longer prevents substantial gainful activity") (quoting 65 Fed. Reg. 42774 (2000)). Furthermore, this is not a case where the ALJ found the claimant did not have a mental impairment. To the contrary, the ALJ found the plaintiff did have a severe mental impairment and limited him to a range of unskilled work, the least complex type of work. SSR 82-41, 1982 WL 31389, at *2.

20

The Social Security Administration has noted that the GAF scale does not correlate directly with the criteria for evaluating disability based on mental impairments. *See Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed.Reg. 50746, 50764–65 (Aug. 21, 2000). Further, as argued by the Commissioner, the cases to which the plaintiff cites in support of his position that the ALJ erred, in addition to not being binding on this court, are not persuasive. For example, the court in *West v. Astrue*, No. 09-2650, 2010 WL 1659712, at *4 (E.D. Pa. Apr. 26, 2010) held that the ALJ erred in not evaluating a series of GAF scores of 50 or below, issued over almost a two-year period.  Another court distinguished *West* (and another case), noting that the ALJ in *West* had "cherry-pick[ed]" high GAF scores, while ignoring lower ones. *See Rios v. Astrue*, No. 09-5004, 2010 WL 3860458, at * 8 (E.D. Pa. Sep. 30, 2009). The plaintiff does not cite any cases finding remand appropriate where there is only one GAF score in the record. As the plaintiff did not have a history of GAF scores indicating symptoms more severe than found by the ALJ, his argument fails.  Furthermore, district courts in this circuit have held that an ALJ's failure to specifically discuss GAF scores does not render the RFC assessment unsupported by substantial evidence.  *See Nixon v. Astrue*, No. 2:11cv122, 2012 WL 589200, at *19-20 (E.D. Va. Jan. 18, 2012), *Report and Recommendation adopted by* 2012 WL 589289 (E.D. Va. Feb. 22, 2012) (finding substantial evidence supported RFC assessment limiting the claimant to simple, repetitive work requiring only occasional decision making, occasional changes in the workplace, and limited interaction with the public and co-workers, despite ALJ's failure to discuss the claimant's four GAF scores); *Love v. Astrue*, No. 3:11cv14-FDW-DSC, 2011 WL 489989, at *5-6 (W.D.N.C. Sept. 6, 2011), *Report and Recommendation adopted by* 2011 WL 4899984 (W.D.N.C. Oct. 14, 2011) (finding substantial evidence supported RFC assessment despite ALJ's failure to discuss the claimant's four GAF scores and further finding claimant's "contention that a GAF of 50 or below is a benchmark of employability in the Social Security arena is without

merit" as "there is no reciprocal conclusion that a person with a GAF of 50 is unable to meet the basic mental demands of competitive remunerative unskilled work").

The plaintiff further argues that the ALJ should have found that Dr. Gay's treatment notes (outside of the initial GAF score) show that the had more limitations than found by the ALJ. However, "[i]t is not within the province of a reviewing court to determine the weight of the evidence, nor is the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

The ALJ considered the opinion evidence in formulating the plaintiff's RFC (Tr. 25-26). He noted that none of the plaintiff's treating physicians provided opinions that conflicted with the RFC assessment (Tr. 25). *Lee v. Sullivan*, 945 F.2d 687, 693 (4th Cir. 1991) (affirming ALJ holding that claimant was not disabled where none of claimant's doctors opined that claimant was disabled). The ALJ noted that the physicians did mention that the plaintiff was doing well after his surgery (Tr. 25; *see* Tr. 216, 219). He further noted that Dr. Poletti only restricted the plaintiff from doing any heavy overhead lifting, bending, twisting, pushing, or pulling (Tr. 25; *see* Tr. 376). Dr. Poletti's opinion, which was consistent with the evidence in the record, was entitled to weight. In addition, the ALJ accorded great weight to the State agency physicians' and psychologists' opinions, as they were consistent with the evidence as a whole (Tr. 25-26). These physicians concluded the plaintiff could perform a range of light work with certain postural and manipulative limitations (Tr. 255-62, 265-72, 405-12). Further, Dr. Varner reviewed the plaintiff's medical records and assessed the limitations caused by his mental impairments (Tr. 417-430), concluding that the plaintiff was able to understand, remember, and carry out simple instructions; could maintain concentration for two hours; would be best not working with the public; and would be able to be aware of normal work hazards (Tr. 433). State agency medical consultants "are highly

qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i); *see Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) ("[W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.").

Based upon the foregoing, this court finds that this allegation of error is without merit, and the ALJ's RFC assessment is based upon substantial evidence.

### Credibility

The plaintiff also argues that the ALJ failed to properly assess his credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . .
> It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4.  Furthermore, it "must be sufficiently specific to

make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565.  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor

24

disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p).

The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id.* at 565 n.3 (quoting *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996)). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

The ALJ considered the plaintiff's subjective complaints, but found they were not entirely credible (Tr. 21-26).  First, he noted that the plaintiff's complaints were inconsistent with the medical evidence (Tr. 22-23). For instance, while the plaintiff testified that he had severe lower back pain (Tr. 42), the ALJ observed that the medical records from specialists showed no complaints of pain in the lower back (Tr. 22-23). The plaintiff testified that he had trouble sleeping during the night, slept late in the mornings, had adverse side

effects, i.e., sleepiness and dizziness, and needed to lie down three or four times a day (Tr. 54). However, the ALJ found that the plaintiff had not complained of medication side effects, reported that he slept well with medication, and said that he was happy with his medication regimen (Tr. 23; *see* Tr. 353, 464). *See* 20 C.F.R. § 404.1529(c)(4) (stating an ALJ must consider whether there are conflicts between a claimant's statements and the rest of the evidence). In addition, the ALJ observed that the plaintiff had complained that he could not afford medication, but that, five to eight months before, he had received $100,000 from his worker's compensation claim (Tr. 23; *see* Tr. 45-46).

The ALJ also observed that the plaintiff's mental health treatment providers thought that the plaintiff might have been malingering or exaggerating his degree of impairment (Tr. 23; *see* Tr. 385, 393). Similarly, the ALJ concluded that the evidence "strongly suggests" that the plaintiff exaggerated his symptoms relating to neck pain, back pain, and hand pain (Tr. 24). While the ALJ conceded that the plaintiff's carpal tunnel syndrome caused some pain, he noted that the evidence did not support his claims, such as an inability to grip even small things (Tr. 24; *see* Tr. 55). For instance, a May 2009 examination, just four months prior to the disability hearing, was benign, showing an almost normal spinal exam, with only some pain on range of motion in the cervical spine (Tr. 470-72). The plaintiff had positive signs for carpal tunnel syndrome, but only slightly reduced grip strength (Tr. 471-72). A month later, he complained of severe carpal tunnel pain, but denied neck pain and radicular symptoms (Tr. 468). Furthermore, an MRI of the cervical spine in June 2009 showed only mild to moderate irregularities (Tr. 480).

The plaintiff argues that the ALJ erred in evaluating his medication side effects (pl. brief 35-36). As noted above, the ALJ found that the plaintiff's allegations were undermined by the fact that he had not complained to his physicians that his medications made him dizzy, sleepy, and tired (Tr. 23). The plaintiff argues that he did complain (pl. brief 36). He cites treatment notes from Dr. Gay on April 30, 2008, noting that the plaintiff

26

complained of "sleeping a lot" (Tr. 464).  However, Dr. Gay also noted on that date that the plaintiff was "sleeping ok" and specifically indicated that no adverse side effects were recognized (Tr. 464).  The plaintiff also cites a treatment note dated October 5, 2008, wherein Dr. Gay noted the plaintiff complained of being tired and stated, "the medication keeps me tired" (Tr. 459).  However, at his next appointment in January 2009, the plaintiff told Dr. Gay that he was satisfied with his current medications, and Dr. Gay indicated that no adverse side effects were recognized (Tr. 457-58).  Again, in May 2009, Dr. Gay noted that the plaintiff was pleased with his medications and no adverse side effects were recognized (Tr. 454-55).  Based upon the foregoing, the allegation of error is without merit.

The plaintiff also argues that the ALJ erred in considering his worker's compensation award when evaluating his claim that he could not afford medication (pl. brief 37-38).  It is undisputed that the plaintiff testified that he received a worker's compensation settlement of $100,000 in August 2008 (Tr. 45-46).   The plaintiff claims that he did not receive all of the settlement (pl. brief 37 (citing Tr. 200)).  The compromise settlement agreement shows that the award was for $120,000 and that the plaintiff received approximately $80,000 after deducting legal fees and costs (Tr. 200). Nevertheless, as noted by the ALJ, in the Spring of 2009, just a few months after he received the settlement, the plaintiff told his doctors that he could not afford treatment (Tr. 23 (citing Tr. 449, 454, 484)). While the plaintiff suggests that he could have spent all of his money in the interim, it was reasonable for the ALJ to find an allegation that he could not afford medication was suspicious. 20 C.F.R. § 404.1529(c)(4) (an ALJ may consider inconsistencies in the evidence).

Based upon the foregoing, this court finds that the ALJ's credibility finding was supported by substantial evidence. "It is not within the province of a reviewing court to determine the weight of the evidence, nor is the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." *Hays*

*v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990) (citing *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).  Moreover, even if the ALJ did err in considering the plaintiff's workers' compensation award and/or in evaluating the plaintiff's side effects, this court finds that any error in this regard is harmless as the ALJ's finding is supported by other substantial evidence. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4ᵗʰ Cir. 1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

### *Sentence Six Remand*

The plaintiff argues[4] that the case should be remanded under sentence six of 42 U.S.C. § 405(g) in light of "new evidence" he submitted. It is the plaintiff's burden to establish that remand is appropriate under a sentence six remand.  The plaintiff must show "that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . . " 42 U.S.C. 405(g); *see Shalala v. Schaefer*, 509 U.S. 292, 297 n. 2 (1993) ("sentence six remands may be ordered in only two situations: where the Secretary requests a remand before answering the complaint, or where new, material evidence is adduced that was for good cause not presented before the agency."). Remand on the basis of newly discovered evidence is appropriate if: 1) the evidence is relevant to the determination of disability at the time the application was first filed; 2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; 3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and 4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir.1985)[5] (citing 42 U.S.C. § 405(g)).

---

[4]As noted above, the plaintiff has also filed a separate motion to remand (doc. 15).

[5]"Though the court in *Wilkins* [*v. Sec'y of Health & Human Servs.*, 925 F.2d 769, 774 (4ᵗʰ Cir. 1991)] indicated in a parenthetical that *Borders*' four-part test had been superseded by 42 U.S.C. § 405(g), the Fourth Circuit has continued to cite *Borders* as the authority on the requirements for

In this case, the evidence is a subsequent decision, dated November 12, 2010, finding the plaintiff was disabled the day after the ALJ's decision at issue here (*see* doc. 15-1). In a recent case, the Honorable Cameron McGowan Currie, United States District Judge, held that "a subsequent finding of disability does not, alone, necessarily constitute new and material evidence." *Wood v. Astrue*, No. 4:10-927-CMC-TER, 2011 WL 4344113, at *2 (D.S.C. Sep. 14, 2011) (denying a motion to remand where a subsequent decision found the claimant disabled three days before the ALJ decision being considered by the court).[6] Judge Currie noted that "[a] subsequent finding of disability does not relieve [a claimant] of her burden of satisfying the *Borders* factors" and further noted that the claimant in that case made no "attempt to satisfy the *Borders* factors, but rather relie[d]

---

new evidence when presented with a claim for remand based on new evidence, and the U.S. Supreme Court has not suggested that the *Borders* construction of § 405(g) is incorrect." *Ashton v. Astrue*, C.A. No. TMD 09–1107, 2010 WL 3199345, at *3 n. 4 (D. Md. Aug.12, 2010) (citing cases).  *See Elkins v. Astrue*, C.A. No. 4:10-2648-TER, 2012 WL 602779, at *4 n.3 (D.S.C. Feb. 24, 2012).

[6] As in *Wood*, the plaintiff argues that the Fourth Circuit's decisions in *Albright v. Comm'r of the Soc. Sec. Admin.*, 174 F.3d 473 (4th Cir. 1999) and *Lively v. Sec'y of Health and Human Servs.*, 820 F.2d 1391 (4th Cir. 1987), evidence the Fourth Circuit's view that a subsequent decision is "new evidence." However, *Albright* and *Lively* are distinguishable because they concerned the res judicata effects of a prior agency finding of disability, rather than the evidentiary value of a subsequent agency decision. *See Albright*, 174 F.3d at 476; *Lively*, 820 F.2d at 1392. Some courts have remanded cases under sentence six based on a subsequent favorable finding of disability. *See Luna v. Astrue*, 623 F.3d 1032 (9th Cir.2010) (remand based on subsequent favorable decision appropriate where the parties agreed to a remand and where there was only one day between the denial of the first application and the disability onset date in her successful second application); *Reichard v. Barnhart*, 285 F.Supp.2d 728, 734 (S.D. W. Va.2003) ("in certain circumstances, an award based on an onset date coming in immediate proximity to an earlier denial of benefits is worthy of further administrative scrutiny to determine whether the favorable event should alter the initial, negative outcome on the claim.").  However, this court, like Judge Currie in *Wood*, "is persuaded by the line of cases that have concluded that a subsequent favorable decision in a new claim for SSI does not alone require remand."  *Wood*, 2011 WL 4344113, at *2 n.1 (citing *Allen v. Astrue*, 561 F.3d 646, 654 (6th Cir.2009) ("In the case of a subsequent favorable determination, a sentence six remand is appropriate only if the plaintiff can show new substantive evidence that might have changed the outcome of the prior proceeding, and good cause for failing to bring this evidence in the original proceeding.").  *See also Johnson v. Astrue*, 3:09–cv–02458-JMC, 2011 WL 902966, at *3-4 (D.S.C. Mar. 15, 2011) ("evidence of the later favorable determination should not properly be considered in this matter because it is not part of this administrative record," and "Plaintiff did not satisfy the requirement that a claimant seeking to introduce new evidence make at least a general showing of the nature of the new evidence.").

solely on a subsequent finding of disability as new, material evidence." *Id.* Judge Currie concluded that the claimant failed to meet the *Borders* standard "by failing to identify that new evidence exists that is relevant to the determination of disability at the time the application was first filed in this claim . . . and by failing to show that good cause exists why that evidence was not previously submitted to the Commissioner." *Id.*

Like the claimant in *Wood*, the plaintiff here relies solely on the subsequent finding of disability as new, material evidence. The plaintiff attached a copy of the subsequent favorable decision to his motion to remand (*see* doc. 15-1). The decision was issued on November 12, 2010, finding the plaintiff disabled as of February 13, 2010 (the day after the ALJ's decision at issue here). The subsequent decision refers to evidence considered in deciding the claim and lists the dates the evidence was received from each source (*see* doc. 15-1). However, there is no indication as to the dates the reports were created or the time periods they cover. The plaintiff has failed to show that this evidence relates to the period leading up to the ALJ's decision at issue here. Accordingly, as in *Wood*, the plaintiff has not met the *Borders* standard, and remand under sentence six is not appropriate.

**Appeals Council**

The plaintiff also argues that remand is necessary because the "court 'cannot determine whether substantial evidence supports the ALJ's denial" (pl. brief 27 (citing *Meyer*

*v. Astrue*,[7] 662 F.3d 700 (4th Cir. 2011)).  Here, the Appeals Council denied the plaintiff's

request for review, stating in pertinent part:

> Also, the Appeals Council considered the fact that since the date of the Administrative Law Judge's decision, you were found to be under a disability beginning February 13, 2010, for a period of disability, Disability Insurance Benefits and June 20, 2010, for Supplemental Security Income, based on the applications you filed on June 10, 2010; however, the Council found that this information does not warrant a change in the Administrative Law Judge's decision.

(Tr. 6).  The subsequent favorable decision was not made part of the record by the Appeals

Council.  The plaintiff argues that we cannot know whether the Appeals Council reviewed

evidence supporting the subsequent award, and thus remand is appropriate so that the ALJ

can consider the evidence (pl. brief 27-28).  However, as argued by the Commissioner, the

plaintiff has not shown that the evidence supporting the subsequent award is relevant and

material to the ALJ's decision in the case at bar.  Accordingly, this court finds that a remand

under *Meyer* is inappropriate.

---

[7]In *Meyer*, the Fourth Circuit held that the Appeals Council is not required to articulate its rationale for denying a request for review. 662 F.3d at 706.  The Fourth Circuit then stated that when the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence. *Id*. at 707.  Under the particular facts presented in *Meyer*, the court determined that the new evidence in that case was not "one-sided" and that upon consideration of the record as a whole, the court could not determine whether substantial evidence supported the ALJ's denial of benefits. *Id*. at 707.  In *Meyer*, the ALJ determined that the record lacked certain evidence the ALJ deemed critical; the plaintiff subsequently obtained this evidence and presented it to the Appeals Council. *Id*.  On this record, the Fourth Circuit concluded that "no factfinder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record." *Id*.  Because "[a]ssessing the probative value of competing evidence is quintessentially the role of the fact finder," the case had to be remanded to the ALJ for further fact finding. *Id*.

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed and the plaintiff's motion to remand (doc. 15) be denied.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald<br>
United States Magistrate Judge

February 4, 2013
Greenville, South Carolina